# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **GRETA LEONTIEV**, | Case No. 3:17-cv-772-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CORBETT SCHOOL DISTRICT**, *et al.*, | |
| Defendants. | |

Jill Gibson, GIBSON LAW FIRM, LLC, 121 SW Morrison Street, 11th Floor, Portland, OR 97204. Herbert G. Grey, Herbert G. Grey, Attorney at Law, 4800 SW Griffith Drive, Suite 320, Beaverton, OR 97005-8716. Of Attorneys for Plaintiff.

Karen M. Vickers, Beth F. Plass, MERSEREAU SHANNON, LLP, 111 SW Columbia Street, Suite 1100, Portland, OR 97201. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Greta Leontiev ("Plaintiff") brings this action against Corbett School District (the "School District") and individuals Randi Trani, Carrie Church, David Gorman, Katherine Ziemann, Jenny Layton, Jeff Mershon, and Jill Edwards (collectively, "Defendants"). Asserting claims under 42 U.S.C. § 1983, Plaintiff alleges that all Defendants violated her Fourteenth Amendment rights by interfering with her parent-child relationship, and that Defendant Carrie

Church and the School District violated Plaintiff's First Amendment rights by disparaging her religion.[1] Defendants have moved for summary judgment. For the reasons that follow, this motion is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

It is the responsibility of the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Keiffer v. Pernsteiner*, 967 F.2d 527 (9th Cir. 1992). In order for a party to avoid summary judgment, such facts must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored

---

[1] Plaintiff previously dismissed Jeff Mershon from this action. ECF 33. During oral argument, Plaintiff voluntarily dismissed her state law claim alleging religious discrimination in a place of public accommodation.

information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed R. Civ. P. 56(c)(1)(A). Where an affidavit or declaration is relied on to oppose a summary judgment motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed R. Civ. P. 56(c)(4). Where the party opposing summary judgment is proceeding pro se, the court "must consider as evidence . . . all of [that party's] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## BACKGROUND

Plaintiff is the mother of F.V., a transgender boy who was 15 years old when the events underlying this action took place. F.V.'s father and Plaintiff divorced in 2008, and both have since remarried. After the divorce, Plaintiff initially had full custody of F.V., who for a time only saw his father infrequently. Plaintiff first learned that F.V. identifies as male during his ninth grade school year when he wrote a letter to Plaintiff to reveal his name change. Plaintiff reported that F.V. "was on a continuum sometimes wanting to dress in female clothes and sometimes male." ECF 40-5 (Plaintiff Dep.) 62:20-23. Plaintiff states that she supported F.V. through his gender transition by purchasing masculine clothes for him, providing a therapist for him, and assigning him gender neutral and masculine chores at home. Plaintiff's current husband believes that F.V. "is young and doesn't necessarily know what [he] is doing." ECF 35-3 (Eduardo Leontiev Dep.) 35:17-20.

Defendant Corbett School District is an Oregon Public School District. During the relevant time period, F.V. attended Corbett High School, where he participated in the Corbett

Performing Arts Club ("CPAC"), an extracurricular after school theater program. CPAC meets

and performs at various high school campuses throughout the district. ECF 40-1 (Layton

Dep.) 22:8-14. In order for CPAC to meet at a campus within the district, district policy

mandates that a district staff member be present during each campus meeting. Although the

district does not provide funding to CPAC, the district does the club's accounting. ECF 40-1

(Layton Dep.) 23:4-9. CPAC is run by community volunteers, many of whom are parents of

children enrolled with the School District. Some of the volunteers are also employed by the

district. Each volunteer is required to sign a form stating:

> Thank you for taking the time to volunteer in the Corbett School
> District. * * * We must follow the same rules and regulations
> established for School District employees. * * * Volunteers shall
> not repeat information concerning students or employee's private
> lives. * * * Personal or private conversations pertaining to any
> sensitive subject should be held away from children.

ECF 42 at 2-4.

On Saturday, November 19, 2016, F.V. participated in CPAC's matinee and evening

productions of *A Midsummer Night's Dream*. ECF 35-2 (Plaintiff Dep.) 128:15-17. Between

shows, F.V. told his father and his sister that he felt uncomfortable living in Plaintiff's home, and

he was not planning to return to Plaintiff's home that evening. ECF 35-1 (Van Horn Dep.) 30:11;

ECF 46-1 (J.V. Dep.) 17:10-12. Earlier that morning, F.V. also had told his sister that he was

considering getting emancipated or changing custody to his father. ECF 46-1 (J.V.

Dep.) 18:13-17. After the evening's show, F.V.'s father dropped off F.V.'s sister at Plaintiff's

home, but F.V. stayed at the high school for a cast party hosted by Defendant Carrie Church and

other CPAC volunteers. Defendant Church is a Corbett Middle School teacher and CPAC

volunteer. F.V. was never a student in any of Church's classes, and she "never really had contact

with him at school." Church's daughter, however, is a close friend of F.V., and F.V. had spent a

significant amount of time with Church's family, including joining them on overnight trips. ECF

35-6 (Church Dep.) 112:8-23. The cast party ended at midnight, at which point F.V left with

Church's daughter. Where F.V. went after the cast party and where he stayed that night is

unclear from the evidence.

At 1:34 a.m., Sunday, November 20th, F.V. sent the following email to Plaintiff:

> Hello Mom,
>
> You are probably wondering why I did not come home after the cast party. It's because I am miserable at home. I do not feel like I am being supported, and I am done with contorting myself to fit an image that you have created. You and Dad both refuse to accept that I am a boy, and that my name is [F.V.]. I am so tired of living in a place where I have to endure constant invalidation.
>
> I think it would be a good idea for me to take a break from living with you for a while. It's not forever, but I need some space to heal. I love you, and I am willing to continue going to my therapist. However, I need to live in a place where I feel supported and loved. I know you are trying, and I'm sure we will get to a place where we share a strong relationship again, and we can continue working toward it.
>
> Your son,
>
> [F.V.]

ECF 40-8. Shortly after F.V. sent the email, F.V. and Plaintiff exchanged the following text

messages:

> F.V.: I will be happy to discuss the email in the next therapy session.
>
> Plaintiff: The first house I am going to is the Church's. I will be waking up everyone that I know until you are home
>
> F.V.: I am staying here to save my own life. Do you remember when I used to self harm? I am trying my hardest to avoid that.

ECF 40-7 at 8-10.

At approximately 1:45 a.m., Plaintiff went to Church's home looking for F.V. ECF 35-2 (Plaintiff Dep.) 104:6-12. Church told Plaintiff that although F.V. wasn't there, he was safe. ECF 40-5 (Plaintiff Dep.) 106:1-8. Plaintiff called 9-1-1 and reported F.V. as a missing and endangered juvenile. *Id.* at 109:13-16. At about the same time, Defendant Church filed a report with the Department of Human Services (DHS) alleging that Plaintiff and her husband emotionally abused F.V. ECF 35-6 (Church Dep.) 82:8-25, 83:1-3.

Multnomah County Sheriff Deputies went to Plaintiff's home and interviewed Plaintiff and her husband regarding F.V.'s missing and endangered status. Plaintiff described the text messages she received from F.V. earlier that evening referencing self-harm and that she believed that Defendant Church knew where F.V. was located. ECF 38 at 27. In his report, a deputy noted that Plaintiff and her husband were "both calm yet concerned, and both explicitly expressed that they loved and cared for [F.V.] and were in no way emotionally abusive." F.V.'s stepfather told the deputy that he had used F.V's birth name "since she was a little girl," and it was difficult for him to remember to use F.V.'s new name. ECF 38 at 28. Plaintiff stated that she was "doing all she could to maintain a positive relationship with [F.V.]." *Id.*

At approximately 2:00 a.m., Sheriff Deputies interviewed Defendant Carrie Church at her home. ECF 38 at 7-9. Church consented to a search of her property and stated that she knew F.V. was safe, but denied knowledge of his whereabouts. ECF 38 at 9. A deputy reported that Defendant Church told him that F.V's parents are "conservative Christian people, which isn't necessarily a problem, but I know they are often not supportive of situations like this." *Id.* The deputy further reported that Defendant Church stated, "parents who are emotionally abusive to their children always say they are 'supportive' of them." *Id.* A deputy also reported that "Church stated that she'd recently filed a DHS report about emotional abuse to [F.V.], but she was unable

to articulate the particulars of the abuse." *Id.* Defendant Church told the deputies that she "hypothesized that perhaps if you are a person of a particular religious faith that rejects transgender, then that makes the job of parenting a transgender person a lot more difficult than it needs to be." ECF 35-6 (Church Dep.) 107:18-25, 108:1-3.

At 11:13 a.m. on Sunday, F.V. emailed Plaintiff: "I am safe, and I am planning on going to school tomorrow." ECF 35-2 (Plaintiff Dep.) 174:24-25; ECF 35-2 (email exhibits) at 35. Plaintiff responded, "Your parents have a right to know where you are and you may want to come get belongings. I will need to know who is taking care of you." *Id.* F.V. responded that he was staying at Defendant Katherine Ziemann's house and asked when he could pick up his belongings. Plaintiff told F.V. that she would leave his belongings on the porch and asked F.V. to leave his key under the mat when he picked them up. *Id.* at 34.

Later on Sunday, Defendant Jenny Layton, an aide for Corbett School District and a CPAC volunteer, took F.V. to get his belongings from Plaintiff's home. ECF 40-1 (Layton Dep.) 13:6-13; 54:22-25. F.V. spent Sunday night at the home of Ziemann and her husband, David Gorman, as he had told Plaintiff. Ziemann is a volunteer with CPAC. She is not employed by the School District, but has two daughters who graduated from Corbett High School who knew F.V. Ziemann's husband, Defendant Gorman, is an elected member of the Corbett School Board and occasionally volunteers with CPAC, but is not otherwise employed by the district. F.V. told Ziemann that he had been "kicked out" of his home but told his mother, Plaintiff, where he was staying. ECF 40-3 (Ziemann Dep.) 85:21-24.

At some point on Sunday afternoon, Church, Ziemann, Layton, F.V., and several other community parents and students attended a meeting with F.V.'s attorney, Robert Hildum. ECF 35-11 (Hildum Dep.) 57:1-10. F.V. had approached Hildum in October or November of 2016

seeking legal representation, and Hildum considered himself to be in an attorney-client relationship with F.V. at the time of the meeting. *Id.* 57:24-25. The meeting was held so that Hildum could explain F.V.'s "legal situation," specifically regarding his custody and potential change of custody, to people trying to help F.V. ECF 43-1 (Hildum Dep.) 58:17-21; 59:2-4. Hildum and the attendees also discussed plans for where F.V. would stay during the next several days, and Hildum recommended that F.V. not stay in one place for too long. *Id.* 60:3-8; 71:5-8.

At 6:03 a.m., on Monday, November 21st, Plaintiff emailed F.V., stating that F.V. did not have permission to live anywhere but with his parents. ECF 35-2 (email exhibits) at 34. Ziemann drove F.V. to school that morning. At 12:13 p.m., Plaintiff filed a complaint with Corbett School District Superintendent, Defendant Randy Trani, alleging that Church and Gorman were harboring her child who was a runaway, thereby violating Oregon educator ethics codes. ECF 37-1 at 1. Trani referred the matter to Corbett School District's attorney, asking for a recommendation and an investigation into the matter. ECF 46-4 (Trani Dep.) 59:9-13. As soon as Trani learned that they had been named in a complaint, he told Church and other school employees not to let F.V. stay with them in their homes. *Id.* at 62:7-9.

At approximately 1:00 p.m. on Monday, a Multnomah County Sherriff's Office Investigator located F.V. at school. ECF 38 at 12. The officer contacted Plaintiff and told her that F.V. was safe at school and closed the runaway file on F.V. The officer advised F.V. and Trani that F.V. was expected to return home after school and that he was not permitted to stay at anyone's house. The same day, a DHS case worker interviewed Defendant Church, F.V., Plaintiff, and Plaintiff's family in response to Church's earlier report to DHS. F.V. told the case worker that he had been "couch surfing," that he felt that his stepfather was homophobic, and that he was being emotionally abused. After interviewing Plaintiff and her family, however, the

case worker concluded that "there is enough evidence gathered via this assessment that indicates that [F.V.] has not been emotionally abused by his parents." ECF 39 at 16.

On Monday evening, F.V., Layton, Church, Church's daughter, and Ziemann met for dinner at Ziemann's home and discussed arrangements for where F.V. would stay that night. It was decided that F.V. would stay with Layton. During dinner, Church called DHS and reported that F.V. would be staying that night at Layton's home and provided Layton's name and address. Church confirmed on the phone with DHS, in Layton's presence, that DHS would convey that information to F.V.'s parents. ECF 40-1 (Layton Dep.) 61:6-9; 62:1-6. F.V. then stayed that night at Layton's home. ECF 40-1 (Layton Dep.) 60:19-23; ECF 38 at 19.

On Tuesday, November 22nd, Layton told Trani that F.V. had stayed at her home the prior evening and that she had driven him to school that morning. ECF 40-1 (Layton Dep.) 65:1-3. That evening, F.V. emailed Plaintiff and told her that he was staying at his friend S.M.'s home.[2] ECF 35-2 (Plaintiff Dep.) 181:2-21; 35-2 (email exhibits) at 37. F.V. disclosed to a Multnomah County Deputy Sheriff, however, that F.V. stayed with S.M. until 6:30 p.m. that evening and spent the remainder of the evening at the home of Jill Edwards Turner,[3] a CPAC volunteer whose daughter was a friend of F.V. ECF 38 at 19. F.V. told Turner that he had texted Plaintiff to tell her where he was staying. ECF 40-4 (Turner Dep.) 38:10-14. That evening, Plaintiff again reported to law enforcement that F.V. was missing. ECF 38 at 17.

---

[2] S.M. is the daughter of Defendant Jeff Mershon, who Plaintiff dismissed from this action. During the events in question, Mershon was employed by the School District as a bus driver.

[3] At the time of the events in question, Defendant Turner's last name was "Edwards." For clarity, this opinion will use the name "Turner," even when referencing exhibits that refer to "Edwards."

On Wednesday, November 23rd, Plaintiff came to Turner's home and spoke with Turner and F.V., but F.V. did not leave with her. ECF 42:11-13; 43:6-7. Plaintiff then reported to law enforcement that F.V. was staying at Turner's home. ECF 38 at 41. The responding officer went to Turner's home and both the officer and Turner encouraged F.V. to return home. ECF 40-4 (Turner Dep.) 49:10-21. F.V. left with the officer and was returned to Plaintiff's home.

On November 29, 2016, the district proposed a safety plan, which specifically outlined procedures regarding interaction between F.V., his younger sister, and district employees. ECF 37-2 at 1. Several months later, F.V. spent spring break with his father in Corvallis. After spring break, F.V.'s father filed a petition in state family court for emergency custody. ECF 35-1 (Van Horn Dep.) 36:11-38:13; ECF 35-12. Shortly thereafter, on May 16, 2017, Plaintiff filed this federal lawsuit. On January 24, 2018, Plaintiff and F.V.'s father entered into a stipulated judgment in the state family court that provided for F.V.'s father to have sole custody over F.V. ECF 35-13 at 2.

## DISCUSSION

Plaintiff alleges that Defendants have violated her Fourteenth Amendment right to the care, custody, and companionship of her children, and that Defendant Church and the School District violated her First Amendment right to the free exercise of religion. "To establish a prima facie case under 42 U.S.C. § 1983, [Plaintiff] must demonstrate proof that (1) the action occurred "under color of law" and (2) the action resulted in a deprivation of a constitutional right or a federal statutory right." *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000). Local government entities—in this case the School District—may be sued under § 1983 only if the constitutional violation arises from "execution of a government's policy or custom" *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Defendants move for summary judgment, arguing: (1) the individual defendants were not acting under the color of

law; (2) there was no constitutional deprivation; (3) there was no School District policy or procedure that gave rise to the challenged actions; and (4) the individual Defendants are entitled to qualified immunity. For reasons stated below, the Court finds that there was no constitutional violation, that the individual Defendants are entitled to qualified immunity, and the School District has no liability under § 1983. The Court declines to address Defendants' other arguments.

## A. Individual Defendants are Entitled to Qualified Immunity

Whether public officials are entitled to qualified immunity generally involves a two-pronged inquiry: (1) whether the officials violated a federal statutory of constitutional right, and (2) whether the right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court recently reiterated the standard for the second prong, writing that a right is "clearly established" only if the legal principle is dictated by "controlling authority" or "a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 238 S.Ct. 577, 589-90 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The Supreme Court explained that the "'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him," emphasizing that the rule must have been previously expressed with "a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015) (*per curium*)).

### 1. Fourteenth Amendment Claim

#### a. Constitutional Violation

The Due Process Clause of the Fourteenth Amendment protects a "liberty" interest—or, a substantive due process right—that includes the right to family integrity, familial association, and the right of parents to direct the upbringing of their children. *See Troxel v. Granville*, 530 U.S. 57 at 65-66 (2000); *Kelson v. City of Springfield*, 767 F.2d 651, 654 (1985). State

interference with the parent-child relationship may give rise to a § 1983 action for damages. *See Morrison v. Jones*, 607 F.2d 1269, 1275-76 (1979). To constitute a Fourteenth Amendment violation, however, the state interference must "shock [] the conscience" or "offend the community's sense of fair play and decency." *Rochin v. California*, 342 U.S. 165, 172-73 (1952). "Mere negligence or lack of due care by state officials in the conduct of their duties does not trigger the substantive due process protections of the Fourteenth Amendment and therefore does not state a claim under section 1983." *Woodrum v. Woodward Cty., Okl.*, 866 F.2d 1121, 1126 (9th Cir. 1989).

The Supreme Court has found an unconstitutional interference with parental rights where the state prohibits or forbids some act. *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (holding that the state cannot forbid teaching foreign languages to students below eighth grade); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (holding that states cannot require all students to attend public school); *Troxel v. Granville*, 530 U.S. 57 (2000) (holding that a state cannot order visitation rights with a non-parent against the wishes of a fit custodial parent). The parental right to control the upbringing and education of one's children, however, is not unlimited.

In *Fields v. Palmdale School District*, the Ninth Circuit held that when parents make the decision to send their children to public schools, their "fundamental right to control the education of their child is, at least, substantially diminished." 427 F.3d 1197, 1207 (9th Cir. 2005). *Fields* dealt specifically with parents' rights to control curriculum and other classroom activities. The case also supports the general proposition that when parents permit their children to participate in community or after school programs, they accept that their children may be exposed to and influenced by ideas and world views that differ from the parents' own. *See also Arnold v. Bd. of Ed. of Escambia Cty. Alabama*, 880 F.2d 305 (11th Cir. 1989), *abrogated in party by*

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) (acknowledging that school counseling "intrudes somewhat" on parental rights, but concluding that counselors play "an important role . . . as trusted confidant of many students" and limiting Fourteenth Amendment violations to instances of coercive pressure).

The Ninth Circuit also recognizes substantive due process violations where reckless, intentional, or deliberate acts or omissions by state officials—especially law enforcement— directly and legally deprive a parent of the right to association with a child. *See Lee v. City of Los Angeles*, 250 F.3d 668 (2001) (holding that allegations of the wrongful arrest and extradition of a mentally disabled child and the police department's subsequent withholding of information from the child's mother sufficiently stated a substantive due process claim). *Cf. Rosenbaum v. Washoe Cty.* 663 F.3d 1071 (9th Cir 2011) (per curiam) (holding that a police officer's inappropriate and offensive words to a child in the midst of a parent's arrest "did not come close" to violating the plaintiff's right to family integrity, but recognizing that verbal abuse could potentially rise to the level of a constitutional violation); *Sandoval v. Las Vegas Metro Police Dep't*, 756 F.3d 1154, 1167 (9th Cir. 2014) (recognizing the right to familial association, but holding that the police did not violate that right when they detained a child for 40 minutes despite not having a reasonable belief that the child had committed a crime).

In *Hollander v. Rainer Sch. Dist.*, 2013 WL 1193888 (D. Or. Mar. 22, 2013), a court in this district declined to dismiss a plaintiff's substantive due process claim based on the plaintiff's allegations that the school district had interfered with his parental rights. The plaintiff alleged that school district employees repeatedly removed his contact information from its records, hosted his children overnight without the plaintiff's knowledge or consent, made a bad faith report to DHS regarding the suitability of the plaintiff's home, and took his child to the

emergency room without notifying him. *Id.* at *2. Plaintiff invokes *Hollander* in her opposition to Defendants' motion, arguing that the interference at issue in her complaint is more severe than the interference alleged in *Hollander*. The court in *Hollander* specifically noted, however, that while it was clear that Plaintiff had a liberty interest at stake, "proof at trial or summary judgment" would ultimately determine whether Defendant's actions met the "shocks the conscience" standard. *Id.* at *10. The *Hollander* case, thus, has little application at the summary judgment stage of the pending lawsuit.

Evidence of coercion is an important—and perhaps even a necessary—element to find that acts of interference with a parent-child relationship meet the "shocks the conscience" standard. A case from the Eastern District of Michigan considered whether facts similar to those presented in this case met that standard. In *Reardon v. Midland Cmty. Schs.*, 814 F. Supp. 2d 754 (E.D. Mich. Sept. 2, 2011), the plaintiff parents brought suit against a school district after their daughter's teacher: (1) encouraged the daughter to seek a protective order against her parents; (2) offered to serve as the daughter's foster parent; (3) instructed the child to retain an attorney; (4) helped the daughter devise an "exit strategy" from the parents' home; and (5) offered to purchase a phone for the daughter to prevent the parents' monitoring of her communications. *Id.* at 762-63. The teacher later rescinded her offer to take the daughter in as a foster child, but offered to arrange for her to meet with a "shelter house." *Id.* The daughter left her parents' home upon turning 17, as she was legally entitled to do under the applicable state law, at which point the teacher continued to provide various forms of material support to her.

The court in *Reardon* held that there was no substantive due process violation, emphasizing the lack of evidence that the teacher had exerted coercive pressure on the daughter to leave home. Rather, the daughter approached the teacher to indicate her desire to leave home

and to discuss her problems with her parents, and the teacher offered alternatives and support for her decision. *Id.* The court concluded that the Constitution does not obligate teachers to "meet [a student]'s request for assistance with silence or a cold shoulder"—even when that student may be overreacting to a parent's reasonable rules. *Id.*

In *Benitez v. Gresham Barlow School Dist.*, 2012 WL 3878419 (D. Or. Sept. 6, 2012). a court in this district also emphasized the lack evidence of coercion in dismissing a factually similar case. *Benitez* involved a student who had run away from her parents' house and, with her parents' permission, was living with her grandparents. The parents told the school that the grandparents had no authority over the student, but the school subsequently: (1) permitted the student to attend off-campus activities without seeking the parents' permission; (2) approved the student's school schedule without seeking the parents' permission; and (3) failed to notify the parents after the student was suspended for possession of marijuana. *Id.* at *1-2. A school counselor also advised the student to seek emancipation from her parents. *Id.* The *Benitez* court concluded that the school had been at worst negligent in failing to follow the school district's policies regarding parent notification. *Id.* at *7. As in *Reardon*, the *Benitez* court emphasized that no defendant had coerced the student to alienate herself from her parents, and that the student's relationship with her parents was strained before any action on the part of the defendants.

In the pending case, as in *Benitez* and *Reardon*, Plaintiff has not raised a triable question of fact as to whether Defendants exerted coercive pressure on F.V. to leave home. Importantly, there is undisputed evidence that F.V.'s relationship with Plaintiff already was strained before the incidents underlying this action. At a minimum, F.V. perceived the relationship with Plaintiff to be strained. F.V. told his father on the evening of November 19, 2016 that he no longer wanted to live with Plaintiff. In the early morning of November 20, 2016, F.V. told Plaintiff that

he "need[ed] some space" and did not intend to come home for a period of time. The actions by Defendants that Plaintiff alleges resulted in an unconstitutional interference with her parent-child relationship with F.V. all occurred after F.V. made these announcements. Thus, the alienation between F.V. and Plaintiff arose before the actions forming the basis of this lawsuit. Plaintiff presents no evidence that Defendants coerced or even encouraged F.V. to stop living at Plaintiff's home. Indeed, it is undisputed that on November 20, 2016, Plaintiff herself suggested to F.V. that he could not come home, left several of F.V.'s personal items on the front porch for him to pick up, and directed him to give back his house key. F.V. and the individual Defendants took Plaintiff's actions to mean that Plaintiff had kicked F.V. out of their home. Plaintiff contends that she did not want F.V. in her home out of concern for the recently opened DHS inquiry. Regardless of Plaintiff's motives in telling F.V. not to come home, however, no reasonable juror's conscience would be shocked that other adults in the community opened their homes to F.V. in such circumstances.

Plaintiff argues that Defendants took "affirmative action" to separate Plaintiff from her son, contending that Defendants devised "a plan" to prevent F.V. from returning to Plaintiff's home, with the ultimate goal of terminating Plaintiff's custody. Plaintiff presents no evidence, however, that a Defendant who actually knew of F.V.'s whereabouts refused to disclose them to Plaintiff when asked. There is evidence that some Defendants, including Church, Layton, Turner, and Ziemann, developed a plan for F.V. to stay at a different person's home each night. The uncontradicted evidence, however, shows that this plan was based on a recommendation from F.V.'s lawyer to avoid criminal liability for kidnapping or harboring a runaway. There is no evidence that Defendants developed this plan to prevent Plaintiff from contacting her son. Rather, the evidence shows that F.V. consistently updated Plaintiff as to his whereabouts.

Further, on the evening of Monday, November 21, Defendant Church placed a call to DHS to inform them of the name and address of the owners of the home where F.V. would be staying, based on the understanding that DHS would communicate that information to the Plaintiff. On Wednesday, November 23, when F.V. was at Defendant Turner's home, Plaintiff came to Turner's home, spoke with Turner and F.V. and left. Later that evening when a law enforcement officer arrived to bring F.V. to Plaintiff's home, Turner encouraged F.V. to leave with them.

Plaintiff attempts to distinguish *Reardon* and *Benitez* from the circumstances of this case. The child in *Reardon* was slightly older than F.V., and the defendants in that case thought the parents might be physically abusing the child. In the pending lawsuit, no Defendant believed that Plaintiff had physically abused F.V. The parents in *Benitez* also already had permitted their child to live with her grandparents, while in this case Plaintiff had reported F.V. as a runaway. Depending upon the age and maturity of the child and the nature of the parent-child conflict, there may be cases where a school employee's failure to take affirmative steps to reunite children with their parents amounts to negligence that "shocks the conscience" and therefore violates substantive due process. Generally, however, mere negligence is insufficient to amount to a constitutional violation. In this case, Defendants' failure to call law enforcement or otherwise actively send F.V. home is not a conscience-shocking degree of negligence, given Defendants' preexisting relationship with F.V. and F.V.'s proactive role in leaving home. Although the Fourteenth Amendment protects parents' right to associate with and control the upbringing of their children, it does not impose on others—including school employees—an affirmative duty to turn another person's child away when that child seeks comfort, advice, or shelter.

Plaintiff also urges the Court to follow *Keates v. Koile*, which Plaintiff argues is instructive in evaluating qualified immunity in the context of parental rights claims. 883 F.3d

1228 (9th Cir. 2018). *Keates*, however, is distinguishable and sheds little light on the proper resolution of this case. As a preliminary matter, *Keates* was decided at the motion to dismiss stage, where all allegations were to be taken as true. In that case, the plaintiff mother alleged that a child protective services case worker issued a temporary custody notice that revoked the plaintiff's custody of her daughter and arranged for the daughter to be strapped to a gurney and transported by ambulance to a hospital, where she was held without the mother's consent. The case worker also directed hospital staff to tell the mother that she could not contact her daughter and ultimately placed the daughter in foster care for several months. The allegations in the complaint established that the case worker did not have reason to believe that the daughter—who was depressed and had expressed suicidal ideation but was determined by doctors to be at low risk for suicide—was in immediate danger, had not undertaken a reasonable investigation, and had no basis to prevent the mother from seeing her daughter.

In *Keates*, the Ninth Circuit held that the district court erred in dismissing the case on qualified immunity grounds because it was "clearly established" that state officials cannot remove children from their parents without the parents' consent or without a court order, unless a reasonable investigation showed that the child was in imminent danger. Given the many differences between *Keates* and this case, the "clearly established" legal principle in *Keates* has little application here. The pending lawsuit does not involve the removal of a child from his parents' custody. *Keates* involved the legal, but extrajudicial, severance of the plaintiff's custody of her daughter. In the pending case, Plaintiff eventually lost custody of F.V. only after F.V.'s father successfully petitioned the state family court for full custody at F.V.'s urging and after the state court held a full hearing. The actions of the case worker in *Keates* were far more intrusive than those of Defendants in the pending case.

In summary, there is uncontradicted evidence that: (1) the parent-child relationship was already strained; (2) Defendants made attempts, either through F.V. or through DHS, to keep Plaintiff apprised of the F.V.'s whereabouts; and (3) Defendants at no time prevented F.V. from returning home. Given the legal principles identified above, such actions cannot be said to "shock the conscience" or "offend the community's sense of fair play and decency." Plaintiff has thus not been deprived of her right to raise and associate with her child.

### b. "Clearly Established Right"

Because Plaintiff has failed to raise a triable question of fact as to whether she was deprived of a substantive due process right, the Court need not reach the question of whether that right was "clearly established." Moreover, Defendants are entitled to qualified immunity. Plaintiff cites no controlling authority that articulates any specific legal principle that compels the conclusion that Plaintiff's right to associate with her child was violated under the particular facts present in this case. Further, the "consensus of cases of persuasive authority," as described above, supports the conclusion that Defendants' non-coercive behavior does not rise to the level necessary to find a constitutional violation.

### 2. First Amendment Claim

### a. Constitutional Violation

Plaintiff argues that Defendant Church violated Plaintiff's right to the free exercise of religion when Church told a Deputy Sheriff that Plaintiff and her husband were "conservative Christian people, which isn't necessarily a problem, but I know they are often not supportive of situations like this," presumably referring to F.V.'s gender transition. Church affirmed this sentiment in deposition, saying "perhaps if you are a person of a particular religious faith that rejects transgender, then that makes the job of parenting a transgender person a lot more difficult than it needs to be." In response, Plaintiff argues that all Defendants acted as they did because

they disapproved of Plaintiff's religion, although Plaintiff asserts her First Amendment claim only against Defendants Carrie Church and the School District.

Although the government may not "penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities," *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995), there is no evidence in this case that the government penalized or discriminated against Plaintiff in a manner that violates her clearly established rights. Plaintiff cites no case that supports the legal principle that a school employee who expresses her personal opinion of the religious views of a person over whom she exercises no authority is an act of governmental discrimination. Plaintiff relies on Supreme Court cases that overturned laws targeting religious practices, *e.g., Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 410 (1993), and a state court order altering a private organization's expressive religious content, *Hurley* 515 U.S. at 573. Defendant Church's comments to law enforcement officers—who were called by Plaintiff—in Church's own home in the middle of the night on a weekend do not come close to the degree of governmental interference with religious expression described by the Supreme Court in these cases. Indeed, to hold that Church's conduct violated Plaintiff's constitutional right would come dangerously close to violating Carrie Church's own First Amendment right to freedom of speech.

### b. "Clearly Established Right"

As with Plaintiff's Fourteenth Amendment claim, Plaintiff has not raised a triable question of fact as to whether she was deprived of a constitutional right. Further, Plaintiff's asserted violation of right is not clearly established in a manner that includes the facts of this case. Plaintiff cites no case, and the Court can find no case, that supports the constitutional principle that an off-duty teacher who has never had a particular student in her class violates the Free Exercise Clause of that student's parent when the teacher, off school premises, expresses

her personal opinion, even if that expression is critical of the parent's religious beliefs. If a public school teacher makes derogatory comments about a particular religion in a classroom in the presence of students, that teacher very well may have violated clearly established principles under the First Amendment, either in violation of the Establishment Clause or, perhaps, the Free Exercise Clause. But that is not what happened in this case. To find a "clearly established" constitutional violation in this case would be to "define clearly established law at a high level of generality . . . avoid[ing] the crucial question whether the official acted reasonably in the particular circumstances," which the Supreme Court admonished against in *Wesby* and in numerous earlier cases. 138 S.Ct. at 590. (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)) (internal quotation marks omitted).

## B. The School District

To hold a municipal entity liable under § 1983, a plaintiff must show that the entity itself caused the deprivation. *Monell*, 436 U.S. at 693. Municipal entities may be liable under § 1983 only if the injury was directly caused by the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* To establish municipal liability, a plaintiff must show: (1) that she was deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the "moving force" behind the constitutional violation. *Burke v. County of Alameda*, 586 F.3d 725, 734 (9th Cir. 2001). As explained above, however, Plaintiff was not deprived of a constitutional right. Further, there is no evidence that any individual Defendants' actions arose from a School District policy, custom, or practice. Further, to argue that the individual Defendants' did what they did due to the School District's "failure to train" stretches *Monell* liability beyond all appropriate boundaries.

**CONCLUSION**

Defendants' motion for summary judgment (ECF 34) is GRANTED.

**IT IS SO ORDERED**.

DATED this 10th day of August, 2018.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge